**John DEES, Movant–Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 15158.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 20, 1988.

Motion for Rehearing or to Transfer
Denied and Overruled
June 13, 1988.

Application to Transfer Denied
July 26, 1988.

Michael A. Gross, St. Louis, for movant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

MAUS, Judge.

A jury found movant John F. Dees guilty of first degree burglary, § 569.160, and forcible rape, § 566.030.1. It assessed his punishment for burglary at imprisonment for 10 years and for rape at imprisonment for 35 years. He was sentenced accordingly. The sentences were ordered to run concurrently. His convictions were affirmed on appeal. *State v. Dees*, 639 S.W. 2d 149 (Mo.App.1982).

In this proceeding, movant seeks to set aside those convictions and sentences by a motion filed under Rule 27.26. His basic contention is that his trial counsel was ineffective because he did not adequately investigate the possibility of obtaining an expert witness to counter shoeprint comparison testimony that placed him at the scene of the offenses.

An extensive outline of the trial evidence is found in the opinion affirming movant's convictions. *State v. Dees*, supra. A synopsis of that evidence to provide an understanding of the issues in this proceeding is as follows.

The victim awoke in the early morning hours of November 26, 1980, to see a man standing over her. The intruder forced her down the stairs of her apartment to a small bathroom where the rape occurred. The victim was unable to see the man's face. She was unable to identify movant as her assailant. She did give the authorities a general description of him, including his height and weight, the color of his hair and that he had a mustache. She did not ob-

serve a beard. However, when her assailant was bent over her she could see only the top part of his face. She saw that he was wearing a dark stocking cap pulled down close to his eyebrows. The victim's 12–year–old son sleeping in the same room was also awakened. He "played possum." He gave a similar description, but said the intruder had a mustache and a beard.

The assailant left tracks of mud and pieces of mud in the victim's apartment, including the bathroom. A fresh piece of mud was found in the vicinity with the imprint "TRAX". A nearby apartment had also been burglarized the night in question. There was a shoeprint in the mud near that apartment. A plaster cast impression was made of this print. Photographs were made of it.

The movant was arrested in his apartment at approximately 10:00 p.m. on December 12, 1980. At the time of his arrest he admitted everything in the apartment was his except some red gym shorts and Hustler magazines that belonged to his brother Paul. A pair of tennis shoes in his apartment were seized at that time. The shoes were basically blue in color, with red and light brown trim. A dark blue stocking cap was found in his truck.

Dr. Robert Briner was the Director of the Southeast Missouri Regional Crime Laboratory. Evidence in the case was submitted to him for analysis. His testimony included the following.

Approximately 85% of the population are secretors whose bodily fluids may be analyzed and their blood type determined. Approximately 40% of the population has blood type A. An examination of seminal fluid obtained from panties of the victim showed her assailant had blood type A. Dees has blood type A. The victim had blood type O.

Dr. Briner made a comparison examination of the tennis shoes and the pieces of mud, the cast of the print and photographs of the print. However, he stated that he did not primarily rely upon the cast of the print. He explained that the plaster cast did not pick up detail as adequately as the photographs. He said, however, the cast did show the overall class characteristics. He identified five points of individual comparison between the photograph of the shoeprint and the right TRAX shoe taken from Dees' apartment. He also identified eight points of individual comparison between the imprint TRAX and that shoe. He demonstrated that a jigsaw shaped piece of mud from the victim's bathroom fit into the bottom of that shoe. An analysis revealed that green paint on that piece of mud and green paint on the shoe were the "same overall composition." Microscopic comparison of that mud chip demonstrated it had been made by the shoe.

Movant John Dees testified. He denied he committed the burglary or the rape. He testified that he spent the night those crimes were committed with his girlfriend Regina in her apartment. He explained that he was a sign painter. He customarily wore his cowboy boots to work. There he changed into a pair of tennis shoes. His employer identified a second pair of tennis shoes which were found at Dees' place of employment on May 19, 1981. These were not the shoes seized at his apartment. Dees said he had owned these shoes about one year.

Dees further explained that his place of employment was moved between November 25, 1980, and December 12, 1980. During the moving process he found another pair of tennis shoes in a backroom of the initial location of the sign business. He took these shoes for his use. He wore them while painting. He added that the first time he used green paint was on December 11, 1980. The only time he wore the found pair of tennis shoes home was December 12, 1980, the day he was arrested and those shoes were seized. During the trial, the prosecuting attorney had Dees try on the right shoe that was seized at his apartment. When he did, he complained that the shoe was a little small.

Dees further testified that he went home from work at noon on November 26, 1980. His brother, who had been institutionalized for a mental condition, came to his apartment and threatened him. He went to the

office of the apartment manager to use the telephone to report the incident to the police. He later went to the police station to sign a complaint.

In rebuttal, the state presented the testimony of the officer who took the telephone call and prepared the complaint. That officer testified that Dees stated "that his brother had got so wild that morning about 2:15 that he had to leave his apartment." Robert LeFebvre, whose occupation is not disclosed, said that Dees came to his office about 3:00 p.m. on November 26, 1980, and wanted his brother recommitted to the hospital. Dees stated to LeFebvre that Dees' brother threatened his life when he tried to get his brother to leave his apartment "in the early morning hours." LeFebvre observed Dees was wearing tennis shoes similar to the shoes identified as having been seized at Dees' apartment on December 12, 1980.

Dees' girlfriend Regina also testified. She agreed that Dees spent the night in question with her in her apartment. She knew he did not leave during the night because there was a defective door in her bedroom. The door would fall unless it was opened in a particular manner. It did not fall during the night. The evening was memorable to her because November 26, 1980, was her last work day before Thanksgiving. She usually tried to wear something "festive" on the last day of work before a holiday. She remembered that on the morning of November 26, 1980, she wore a green jumpsuit that buttoned all the way up the back. It required Dees to assist in buttoning the back. On cross-examination, she could not remember what she wore the day before the Fourth of July. She went to Dees' place of employment in January or February. She saw some white track shoes with blue stripes and laced work boots in the paint room.

With that background, the following is an outline of the evidence at the 27.26 hearing. The testimony of movant John Dees included the following. His trial counsel, Phillip J. Barkett, Jr., told him that Dr. Briner's identification of the tennis shoe was irrefutable. Barkett advised him

as follows. If Dees admitted the shoes were his he would be convicted. Dees should say the shoes belonged to his brother, or, if he would not say that, he should say he found them. For this reason, he testified at the criminal trial he found those shoes when the sign business was being moved. He admitted that testimony was a lie. He bought those shoes in the early summer of 1980. Dees also testified that Barkett told him that if the prosecuting attorney asked him to try on the right shoe, to lie and say it was a little small. He added that Barkett's senior partner, Robert Dempster, was in on this advice to lie.

Dees further testified that he repeatedly asked Barkett to get an expert to examine the shoes. He said the fee he paid Barkett included the expense of an expert. Dees knew that Barkett submitted photographs of the shoe and shoeprint to an expert in St. Louis. He was informed that the expert said that Briner's testimony was irrefutable. He told Barkett that he did not know whether or not his shoe made the shoeprint. He also told Barkett that if it did, his brother made the shoeprint or the police set him up after they obtained the shoe. Nevertheless, Dees still wanted an expert. In fact, "I got down on my knees and begged him to get an expert." Barkett did not do so. Barkett said that he did not want to prove the state's case.

Dees also testified that on December 12, while he was wearing the shoes in question he was in a muddy field near Charleston. During the preparation of the case he took mud from that field to Barkett "so that we could get an expert to look at the mud and compare the chips to see if they were of the same composition." He further explained that request in the following manner:

And, it was a little muddy, and I got mud on the shoes. And I—whenever I came back to work, and I checked on the sign that I had been painting that was green, you know, and which brings up back to the idea that I thought that the—that the police had something to do with this, and that Mr. Briner was saying—Mr. Briner

was saying that—that the shoe made the print, and I was—I was wanting to have it analyzed, the dirt samples analyzed and compared with that to see if there was any possibility that the police had something to do with it.

Dees said that commencing in the fall of 1980 he kept two pairs of tennis shoes at work. He explained that he used the pair seized from his apartment to wear while spraying paint. He used the other pair while calling on customers. He was unable to say where the spray painting shoes were the night of the rape, at his apartment or at his place of work.

Between his criminal trial and the 27.26 hearing, movant had been married to and divorced from his former girlfriend Regina. At the 27.26 hearing she generally corroborated Dees' testimony. She did produce John Dees' check dated October 28, 1980. She said this check was used to purchase the pair of shoes seized at his apartment. She had given it to Barkett and explained what it was for.

The movant called Curtis Thompson as a witness. Thompson was a retired employee of the Federal Bureau of Investigation. He qualified as an expert in the field of shoeprint identification or comparison. It was his opinion that an adequate identification of Dees' shoe could not be made from the photographs of the shoeprint. He said it was absolutely necessary to make the comparison from the three-dimensional cast of the shoeprint. He explained the difference between class and individual characteristics and mould characteristics found in shoeprints. From a comparison of the shoe in question and the cast of the print, he found no individual characteristics that matched. The same was true as a result of the comparison of the shoe and the photograph and a comparison of the shoe and the mud bearing the impression TRAX and the wedge-shaped pieces of mud. He found more wear on the outer edges of the shoe than was demonstrated by the cast. He also found the shoe was ⅛th inch smaller than the cast. Had he been called as a witness in Dees' criminal trial he would

have testified the shoeprint could not have been made by Dees' shoe.

On cross-examination, Thompson said he could not recall whether or not he was accepted as a Fellow of the American Academy of Forensic Scientists. The prosecuting attorney produced an instrument for Thompson to perform measurements in the courtroom. In referring to his measurements to establish the shoe was smaller, he admitted the difference between the first nodule and the sixth nodule on the shoe and the first nodule and the sixth nodule on the plaster cast was six millimeters. The following developed during his examination:

Q. (By Mr. Ferrell) Now, we have established the difference between the first and the sixth nodule as you measured them here in the courtroom today.

Now, you indicated there's another at an area of this particular cast which is longer than the shoe. Correct?

A. Yes.

Q. In fact, in your prior measurements, this cast was smaller than the shoe. Isn't that correct?

A. Well, in that area, yes.

Thompson thereafter, using the instrument, attempted to demonstrate to the motion court the difference in measurement. The observation by the court was, "I'm sorry, Mr. Thompson. I don't see any difference in it. You may see it, but—."

Thompson admitted that even with the naked eye there could be observed striations on the imprint containing the word TRAX and striations on the bottom of the shoe. He concluded that there was nothing about the TRAX piece of mud and the TRAX emblem on the shoe that would cause him to be able to say the TRAX piece of mud did not come from the shoe. He further stated that the exhibits, other than the cast of the print, including the TRAX piece of mud, the other pieces of mud and photographs had "no connection with my examination." Near the end of his examination Thompson was asked the following question:

THE COURT: Well, let—so that I understand, that cast does not fully and

accurately reproduce that footprint in the mud as it was there at the scene?

He answered:

Well, that's true. It has it's [sic] limitations, and that's one of the limitations.

His cross-examination also included the following: "That is because we are dealing in mud, and you can't make that conclusion as to whether or not that wear pattern is different or whether it's due to mud?" He answered, "No. I don't think—well, you can't from that photograph anyway." In conclusion he said that he could not rely upon the wear pattern to establish that the shoe did not make the impression but relied upon "all the other things that I have testified to, yes Sir."

The movant also called John Cayton as a witness. Cayton was employed by the Regional Criminalistics Laboratory in Kansas City, Missouri. It was stipulated that he was an expert on shoeprint comparison. The various exhibits had been supplied to him at his Kansas City laboratory. Prior to his examination he had also received certain statements and information from Curtis Thompson.

Cayton found no individual characteristics on the shoe to correspond with any individual characteristic on the photographs, the cast, the TRAX mud chip or other mud chips. He found a defect in the heel area of the cast that was not compatible with the piece of glass that was in that area of the heel of the shoe. He also observed a difference in the shoe wrap around in the heel and toe area as compared to those areas in the cast. The heel area in the cast was less distinct than the ridges on the shoe, while the toe area in the cast was more distinct than that area on the shoe. His conclusion was that the impression that made the cast could not have been made by the shoe in question.

However, contrary to Thompson, Cayton found the shoe was longer than the cast. He also found there were measurements in the heel area of the cast ⅛th inch longer than measurements in those areas on the heel of the shoe. On redirect, he said the difference was $^{50}/_{1,000}$ths of an inch. He did observe the striations that have been mentioned. He more or less summarized a large portion of his testimony in the following language:

A. I didn't find any individual identifying characteristics on the—on the shoe that correspond to the cast or the photographs.

There were areas where the mould that produced the shoe had marks on it that were similar, but these would not be class characteristics or individual characteristics, but they would be class characteristics.

Also, in the suction cup area, there are some concentric lines, or circles, that appear on some of the mud fragments. And, again, those are from the manufacturing process and not caused by the wear.

He was also asked the following question and gave the following answer:

Q. Were there any other individual characteristics on the bottom of the shoe that were inconsistent with either the photographs or the plaster cast?

A. The—basically the wear, and—and the measurements are different.

In speaking of the differences he found, he concluded with the following:

A. Two areas of discrepancies, other than the wear, the measurement in the heel area, and the logo, that sometimes are hard to reconstruct or interpret.

. . . .

A. Their—those differences. I can't say for sure if they are caused by environment, the exposure of the shoe, or *if those are in fact differences.* (emphasis added)

In addition he was asked the following question and gave the following answer:

Q. Will you not concede that there is also the possibility to have discrepancies about whether an individual characteristic or a characteristic is present in a shoeprint or anything else, something like maybe it's in the eye of the beholder?

A. Yes.

The movant also tendered William J. Bozziak as a witness. He was employed by

the FBI laboratory in Washington, D.C. Basically, the court excluded his testimony upon the basis that it was cumulative. He was permitted to identify certain exhibits that he had prepared in connection with his examination of the shoe, the cast of the shoeprint and other exhibits in the case.

At the criminal trial movant was represented by Phillip J. Barkett, Jr., as principal counsel. Barkett's senior partner, Robert Dempster, participated as "second chair" and in closing argument. The state's only witness at the 27.26 hearing was Barkett. The following is a summary of his testimony. Barkett was retained after the movant's preliminary hearing had been conducted. He received a letter from the lawyer who had represented the movant during the preliminary hearing. This letter included the following statement:

As the transcript of the preliminary hearing will indicate, the shoes found in John Dees' apartment were worn by the assailant in the rape and burglary which occurred on November 26, 1980. There is no question about this and I believe that the scientific evidence in this regard is unassailable, both as to the class characteristics and the individual characteristics testified to by Dr. Briner.

The letter also reveals that Dees had indicated that he believed his brother perpetrated these crimes. After receiving this letter, Barkett discussed Briner's identification of the shoe with Dees. Dees responded that the shoeprint matched because the police had taken his shoe and made the print. Nevertheless, Barkett investigated the shoeprint evidence. He had the preliminary hearing transcribed and reviewed Briner's testimony. He obtained the reports and statements made by Dr. Briner. He went to Briner's office and examined his laboratory and equipment and discussed with Briner what text might be considered authoritative on shoeprint identification. Barkett took Briner's deposition. Barkett had arranged for movant to be present. Barkett was cautious about bringing an expert to Cape Girardeau to examine the physical evidence. He was worried that he could be providing the state with corroboration of Briner's testimony. He had obtained photographs after the Briner deposition. He submitted those photographs to an expert in St. Louis. This expert said the evidence as to the shoeprint having been made by Dees' shoe was overwhelmingly convincing. In conferences Dees continued to suspect that the police had made the shoeprint or that the print had been made by his brother. When Dees was told of the report by the expert in St. Louis, Dees replied, "So what? You know, I didn't have them that night anyway and I have got an alibi." Dees, with Barkett's help, then agreed that no further effort would be made to find an expert to contest Briner's shoeprint identification. Dees would rely upon his claim of alibi and the assertion that he did not have access to the shoes on the night in question. Barkett emphatically denied that either he or Dempster had counseled Dees to give false testimony.

On appeal the movant states two points asserting the motion court erred in denying movant's 27.26 motion. The rules by which the action of the trial court is to be reviewed are well established. The decisive rules have been repeatedly expressed in the following terms. "[W]e note that a movant or petitioner under this rule has the burden to prove his grounds for relief by a preponderance of the evidence. Rule 27.26(f); ...." *Brown v. State,* 729 S.W.2d 54, 55 (Mo.App.1987) (citation omitted). "The credibility of witnesses at a Rule 27.26 hearing is for the trial court, and it is not required to believe movant's testimony. *Leigh v. State,* 673 S.W.2d 788, 790 [3, 4] (Mo.App.1984)." *Black v. State,* 723 S.W. 2d 474, 475 (Mo.App.1986). "Our review of the trial court's order is limited to a determination of whether the findings, conclusions and judgment are 'clearly erroneous.' " *Moton v. State,* 716 S.W.2d 345, 347 (Mo.App.1986).

The movant's first point is:

The findings, conclusion, and judgment ... were clearly erroneous, in that the evidence established that Appellant was deprived of a fair trial by the unreasonable failure of his trial counsel to proper-

ly investigate and prepare to meet and respond to adverse expert testimony.

This point is obviously in general terms. Reference to argument under the point is necessary to determine if movant attacks all or only specific findings.

From such reference it is apparent the movant does not challenge a finding basic to the motion court's decision and this court's review of that decision. That finding is:

In making the factual determinations herein, this Court has taken into consideration the witnesses' manner while testifying, the ability and opportunity to observe and remember any matter about which testimony was given; any interest, bias or prejudice they may have had; the reasonableness of their testimony considered in the light of all of the evidence in the case; and, specifically, finds that John Dees, an admitted perjurer, and Rita Schiwitz are not credible.

Perhaps the importance of this finding is emphasized by an omission from the statement of facts in movant's appellate brief. That statement does not contain one word concerning the movant's false testimony and his explanation for that perjury.

The record demonstrates inherent improbabilities in some of the testimony of movant and Regina. It includes inconsistencies and self-contradictions in that testimony. It also includes contradictions of that testimony by other witnesses and by exhibits.

It should not be implied from these observations that a trial court may determine that the testimony of a witness is incredible only when contradicted. It is generally held that "[d]efendant had the burden of proof, ... and the trial judge could disbelieve his testimony as to what his attorney advised or failed to advise, even if his testimony stood wholly uncontradicted." *Diercks v. State*, 725 S.W.2d 95, 97 (Mo. App.1987) (citations omitted). Those contradictions are cited only to demonstrate the motion court's basic finding on credibility is also abundantly supported by the record.

■ In his argument movant acknowledges his burden to satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). That test has been recognized and adopted. "In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show (1) that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and (2) that he was thereby prejudiced." *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987).

Movant's argument couches his claim of ineffective assistance of counsel in a series of general charges such as the following:

Barket [sic] made no effort to educate himself regarding the most fundamental concepts of shoe impression analysis prior to trial. One unavoidable consequence of this failure was his inability to effectively depose or cross-examine Dr. Briner. With like significance, he failed to appreciate the need for and to discover the ready availability of responsive experts. (footnote omitted)

He suggests no questions that would have weakened, rather than resulted in a restatement of Briner's testimony. Dees does charge that Barkett did not make "a reasonable effort to identify a truly qualified expert...." Movant then argues that had such "a truly qualified expert" been presented as a witness, the state's case was otherwise weak and movant would have been acquitted.

Movant's argument is based upon two false premises. The first is that the testimony of a truly qualified expert, such as Thompson or Cayton, would be irrefutable proof that Dees' shoe did not make the mud impression. It is true each of those witnesses expressed such a conclusion. However, consideration of all of the testimony of those witnesses demonstrates less than a conclusive basis for that premise. For example, Thompson said the exhibits, other than the cast, including the TRAX piece of mud and jigsaw piece of mud, had no connection with his examination. He later admitted that the cast does not accu-

rately reproduce the shoeprint in the mud. Cayton found the differences between the photographs and the cast and the shoe were the wear and the measurements. He concluded, "Their—those differences. I can't say for sure if they are caused by environment, the exposure of the shoe, or if those are in fact differences." Thompson found the cast was larger than the shoe. Cayton found the cast was shorter than the shoe. Each witness observed striations and concentric lines in the cast that were found on the shoe, but found these to be class characteristics. Neither witness commented on the presence or absence of the green paint and the significance of that paint. The movant's evidence does not demonstrate that a truly qualified expert would provide unequivocal evidence Dees' shoe did not make the shoeprint and other exhibits.

The second false premise is that if Dr. Briner's identification of individual characteristics made by Dees' right shoe was controverted, the movant would necessarily have been acquitted. Even excluding that identification, the evidence of the movant's guilt was great. The general description of the assailant given by the victim and her son was a remarkably accurate description. They described a stocking cap like that found in movant's truck. The assailant's blood type was the same as that of the movant. The movant initially admitted he owned the shoe in question. Only later did he disclaim that ownership and relate that after the rape occurred he found the shoes at his employer's place of business. The jury could also find it incredible the movant customarily wore cowboy boots but kept two pairs of TRAX tennis shoes at his place of work. The jury could also find movant did by his statements to the police officer and Robert LeFebvre establish that he was in his apartment at approximately 2:15 a.m. the morning of the rape and that his alibi was false. The two experts called by movant demonstrate his TRAX tennis shoe had class and mould characteristics compatible with the print and mud chips. No one of the factors standing alone is conclusive evidence of movant's guilt. However, the combination of the accurate general description, stocking cap, compatible blood type, false alibi, and belated denial of ownership of those compatible shoes is compelling evidence of that guilt.

However, the fundamental point is not the fact that the testimony of one or more experts would have contradicted the testimony of Dr. Briner. The fundamental point is whether or not Barkett, in not further investigating the possibility of obtaining such an expert, "failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances." *Sanders v. State*, supra, at 857. The perspective from which an attorney's performance must be evaluated has been unequivocally stated.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–695.

In this case, after receiving the adverse report of the St. Louis expert, Barkett decided further investigation to locate an expert to contradict Dr. Briner would be fruitless and should not be pursued. Movant agreed. The standard by which Barkett's choice or decision on trial strategy is to be measured has also been authoritatively expressed.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments sup-

port the limitations on investigation. In other words, counsel has a duty to make *reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690–691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695 (emphasis added).

The motion court prepared an extremely well reasoned opinion which included recognition of the applicable law and a clear statement of its findings on which its judgment was based. Those findings include the following:

[W]hen first employed, retained trial counsel received a letter from movant's first attorney which told him that the evidence comparing the shoe with the State's footprint was 'unassailable.' Nevertheless, trial counsel had the State's expert's testimony transcribed for his independent examination. Counsel reviewed the critical evidence, both at the police station and at Dr. Briner's office. He took the deposition of Dr. Briner, the State's expert. He knew of Dr. Briner's excellent reputation. All of this was being done while his client was telling him, orally and in writing ..., that he thought the shoe had made the footprint. Movant reasoned before trial that the footprint evidence was valid because either (1) the police had manufactured the evidence, or (2) it was made by Paul Dees, his brother. Even though movant advised his lawyer that the prints and shoes would match because the police '... set it all up to frame me', trial counsel continued to investigate the possibility that the shoe did not make the footprint in question.... Mr. Secundo [an expert he located] opined that the shoe did make the footprint based on all the testimony as well as Dr. Briner's reports and photographs which were sent to him by counsel.... [M]ovant acceded to the decision not to employ an expert to compare the shoe with the shoeprint.

This agreement was dramatically expressed by the movant himself when having been told that Mr. Secundo agreed with Mr. Briner, stated: 'So what, I didn't have them that night—I have an alibi.'

Trial counsel in this case was a well-schooled and experienced criminal advocate. From conversations among movant, his girlfriend, and counsel, a plausible defense of alibi was agreed upon.

The trial court concluded, "that counsel effectively represented movant's interest at the trial level." The findings and judgment of the motion court are not erroneous and are supported by the evidence.

■    The movant's second point is that the judgment must be reversed and the cause remanded to receive the testimony of expert witness Bozziak. As stated, the motion court excluded this testimony because it was cumulative to that of Thompson and Cayton.

Movant's relevant offer of proof was:

He can offer testimony concerning discrepancies that he found between the shoe and the print, discrepancies that other experts have not testified to. He can find discrepancies in the lateral perimeter of the shoe. He has brought large blowups that demonstrate significantly certain areas that are not visible in the other materials....

    . . . .

He would offer testimony concerning the jigsaw piece, make a side by side comparison of microscopy examination of the pieces and show photographs to the Court and demonstrate that these particular pieces are specifically mould characteristics.

He has done blowup examinations of the Trax emblem. He will testify as to why those were mould characteristics and not individual characteristics.

He can point to the fact that Dr. Briner's testimony concerning the identification of the shoe was in fact incorrect and that there are no identifying characteristics consistent with the shoe.

Again, he can point to various dissimilarities. He can testify concerning the

wear on the particular shoe, and the significant difference on the wear on the shoe and the plaster cast and the photograph and the imprint that was left in the mud.

Contrary to movant's contention, that offer of proof supports the motion court's determination the testimony of Bozziak would be cumulative.

The motion court had broad discretion in excluding cumulative evidence. *State v. Rhoden,* 654 S.W.2d 352 (Mo.App.1983). Cayton and Thompson testified at length. The transcript of their testimony consists of 270 pages. The motion court was made aware there were experts who would have contradicted the testimony of Dr. Briner. The motion court's findings and judgment are premised upon the availability of such experts. This makes it abundantly clear the motion court did not abuse its discretion in excluding the proffered cumulative testimony. The judgment is affirmed.

PREWITT, P.J., and FLANIGAN, J., concur.

HOGAN, J., not participating.